# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS SERAFIN; MICHELE GRAHAM TURNER 1995 REVOCABLE TRUST, JEFFREY TURNER AS TRUSTEE; AND EDWARD L. FROEHNER, | **No. 15-CV-8563** |
| Plaintiffs, | |
| v. | |
| NICHOLAS S. SCHORSCH; DAVID KAY; BRIAN BLOCK; LISA MCALISTER; LISA BEESON; LESLIE MICHELSON; EDWARD G. RENDELL; WILLIAM STANLEY; AND SCOTT BOWMAN, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Defendants, | |
| -and- | |
| VEREIT, INC., (FORMERLY KNOWN AS AMERICAN REALTY CAPITAL PROPERTIES, INC.), | |
| Nominal Defendant. | |

Plaintiffs Thomas Serafin, Michele Graham Turner 1995 Revocable Trust, Jeffrey Turner as Trustee, and Edward L. Froehner, by their undersigned attorneys, for this Shareholder Derivative Complaint, allege the following upon personal knowledge as to their own acts, and upon information and belief as to all other matters, upon the investigation of their counsel. This investigation included the review of information relating to the relevant time period obtained from public and proprietary sources – including, *inter alia*, United States Securities and Exchange Commission ("SEC") filings, sworn allegations in *Lisa Pavelka McAlister v. American Realty Capital Properties, Inc., et al.*, Index

No. 162499/2014 (Sup. Ct. N.Y. Cnty.), court filings, public reports, press releases, news articles and other media reports. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1.      This is a shareholder derivative action on behalf of nominal defendant Vereit, Inc. ("Vereit"), formerly known as American Realty Capital Properties, Inc. ("ARCP"), against certain of its former officers and directors (Vereit and ARCP are sometimes referred to herein as "the Company"). Vereit is a publicly traded Real Estate Investment Trust ("REIT") incorporated under Maryland law and is headquartered in Phoenix, Arizona. Vereit is part of a REIT business empire built by Nicholas S. Schorsch ("Scorsch"), prior to his departure from the Company in late 2014.

2.      This case arises out of the Company's announcement on October 29, 2014, that, due to the discovery of "intentional" accounting errors, ARCP's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2014 and June 30, 2014, and ARCP's earnings releases and other financial communications relating to these periods, could no longer be relied upon.

3.      According to the October 29, 2014 release, an investigation conducted by the Audit Committee of the Board of Directors of ARCP revealed that ARCP incorrectly reported its adjusted funds from operations ("AFFO"), a financial measure commonly used for REITs, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. This "error" was subsequently identified but "intentionally not corrected," and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of net losses for the three and six months ended June 30, 2014, totaling $23 million.

4.      ARCP announced that it was taking "personnel and other actions necessary to ensure that this does not happen again," and that Chief Financial Officer ("CFO") Brian Block ("Block") and Chief Accounting Officer ("CAO") Lisa McAlister ("McAlister") had "resigned." Remarkably, notwithstanding the serious nature of the fraud, the Board expressed "its full confidence in the management team and staff," and that it continued to "support management's efforts surrounding the simplification of the business, enhancements in transparency, and improvements to the predictability of our earnings, all with the goal of enhancing long-term value."

5.      These revelations of fraud severely damaged ARCP. The stock price immediately fell by approximately 30%, wiping out over $3 billion in shareholder value. A criminal probe reportedly was initiated, led by the Federal Bureau of Investigation ("FBI") in conjunction with prosecutors from the U.S. Attorney's office for the Southern District of New York. And, the SEC announced its own investigation. Furthermore, at least ten securities class action lawsuits were filed against ARCP, asserting claims on behalf of defrauded purchasers of ARCP stock and bonds, which actions were subsequently consolidated and remain pending at this time.

6.      ARCP also suffered several material business setbacks due to the fraud. Following the revelations of fraud, certain financial services firms suspended their sales of its REIT products to retail investors. In addition, at the time the scandal was revealed, ARCP was preparing to sell its Cole Capital Partners, LLC and Cole Capital Advisers, Inc. real estate investment units to retail brokerage firm RCS Capital Corp. ("RCS") in a $700 million transaction. RCS immediately terminated the transaction, citing the announcement of ARCP's accounting improprieties.

7.      The other shoe dropped on December 15, 2014, when ARCP filed a Form 8-K announcing suddenly that Schorsch *himself* had resigned as Executive Chairman, and that ARCP was unwinding its business relationships with him and his related REIT entities. The Form 8-K also

announced the resignations of David Kay ("Kay"), the CEO and a director, and Lisa Beeson ("Beeson"), the President and Chief Operating Officer ("COO"). As Kevin Gannon, a managing director and analyst for Robert A. Stanger, commented, "It's unprecedented to have three top executives at one of the largest REITs in the world step down on the same day. I've never seen anything like it." Thus, within six weeks after the initial disclosure, the founder and Executive Chairman, CEO, CFO, President and COO, and CAO all left the Company or were terminated.

8.     The reason for the exodus became apparent just days later when, on December 18, 2014, McAlister, the former CAO, sued ARCP, Schorsch and Kay for defamation in the Supreme Court of the State of New York for New York County. In a verified complaint, McAlister described in detail how, despite her warnings that ARCP's accounting and disclosures were improper, Schorsch and Kay ignored her objections, and instead directed the false statements to be made. McAlister further alleged that the October 29, 2014 press release announcing the fraud wrongfully blamed her when "the improper accounting practices were caused in the first instance by Mr. Kay and Mr. Schorsch." McAlister also alleged that she had not "resigned," but had been terminated for blowing the whistle on ARCP, Schorsch and Kay regarding the improper accounting practices.

9.     On March 2, 2015, ARCP announced a wide-ranging restatement of financial results, revealing that the misconduct was far more pervasive than had been previously disclosed. For example, the Company admitted that AFFO – the key financial metric for REITs – had been overstated not only for the first two quarters of fiscal year 2014, **but for all of fiscal years 2011, 2012, and 2013 as well,** the entire duration of ARCP as a public company. Furthermore, the Company's net loss for fiscal year 2013 was increased by $16.8 million, while AFFO fell by about $44 million, or 20 cents a share, compared with previously reported amounts. For the second quarter of 2014, the restated net loss was $54.7 million, compared with $40.3 million reported initially.

10.     The March 2, 2015 announcement also revealed that certain improper equity awards had been made to Schorsch and to Block, and that improper payments of $8.5 million had been made to one of Schorsch's affiliated entities. ARCP further disclosed shocking breakdowns in its internal controls over financial reporting and its disclosure controls and procedures, all of which constituted "material weaknesses." ARCP also confirmed that the SEC had commenced a formal investigation of the fraud, and that the U.S. Attorney's Office for the Southern District of New York had contacted the Company.

11.     As alleged herein, these developments plunged the Company into a period of enormous chaos and uncertainty. The officers and directors of ARCP owed fiduciary duties of care and loyalty to make proper and truthful disclosures to its shareholders and investors.  In order to adequately carry out these duties, it was necessary for them to know and understand the material information that had been discovered, but intentionally misstated in ARCP's public statements. Notwithstanding their duties, the officers and directors failed, on multiple occasions, to reveal, either in whole or in part, the truth regarding ARCP's financial results. Furthermore, they breached their duties of loyalty by enriching themselves at the expense of their shareholders.

12.     As alleged herein, the officers and directors caused or allowed ARCP to issue or make materially false and misleading statements regarding its financial performance. Even when the truth began to slowly leak out, the officers and directors caused ARCP to issue misleading statements on October 29, 2014 downplaying the materiality of the negative information, and reinforcing the materially false and misleading statements issued prior thereto. The failure of ARCP's officers and directors to accurately report financial information constituted a deliberate concealment of a material issue that could have been expected to impact future operating and financial conditions.

13.     Plaintiffs initially did not make a pre-suit demand on the Board to pursue the claims set

forth herein, alleging in the consolidated action *Serafin et al. v. Schorsch et al.*, No. 14-cv-9672-AKH (S.D.N.Y.) that such a demand would have been futile, and was therefore excused. By order dated June 24, 2015, U.S. District Judge Alvin K. Hellerstein held that plaintiffs had not alleged demand futility with sufficient particularity under Maryland law, and dismissed the action.

14.     By letter dated August 10, 2015, plaintiffs therefore made a demand on the Board of ARCP to pursue claims against the alleged wrongdoers. *See* Exhibit A. By letter dated September 17, 2015, the Board rejected plaintiffs' demand, basing its conclusion on reasoning set forth in a June 18, 2015 letter it sent to another shareholder, Joanne Witchko ("Witchko"), by which the Board rejected Witchko's demand. *See* Exhibit B.  As reflected in the Board letters included in Exhibit B, the Board refused plaintiffs' demand based on the purported "likely negative impact" taking action on the Company's behalf would have on the Company, and the assertion that ongoing securities litigation and government inquiries "would yield more information" concerning the claims at some future time.

15.     The Board's rejection of plaintiffs' demand on these bases was wrongful and taken in bad faith. In particular, the Board's letters confirm that it: (a) failed to hire independent counsel to actually *investigate* possible claims; (b) failed to produce a written report detailing its process, reasoning and conclusions; (c) failed to document its purported evaluation of claims, defenses and remedies; (d) failed to interview witnesses; (e) failed to review documents; and (f) held just three Board meetings with purportedly independent counsel. Not surprisingly, based on this hopelessly flawed process, the Board concluded that it would do nothing, indefinitely. The Board failed to substantiate the reasons it did express for its failure to act, which are baseless and pure conjecture, as alleged herein.

16.     Given the severity of the fraud in this matter, which resulted in the highly suspicious departure of the *entire senior management team* amid allegations and admissions of intentional (and

6

possibly criminal) conduct by top executives, the Board's failure to act is not entitled to business judgment rule protection. The Company successfully moved to dismiss *Serafin* on the basis that a demand on the Board needed to be made. Yet after receiving a demand, the Board refused to act, sitting idly by as other litigants pursue what are likely finite sources of recovery from the alleged wrongdoers, such as their personal assets and any applicable insurance proceeds.

17.     This action is brought against (a) each former executive of the Company who left after the fraud was revealed, and (b) each former director who served on the Audit Committee at relevant times. These defendants had direct responsibility for the Company's financial reporting and its internal reporting controls. No current officer or director is named as a defendant.

18.     This action seeks to recoup losses that Vereit has already sustained, and will continue sustaining, in connection with the accounting restatement and all related proceedings.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because complete diversity exists between plaintiffs and each defendant, and the amount in controversy exceeds $75,000 exclusive of interest and costs. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

20.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, a citizen of New York, or is an individual with sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because ARCP formerly maintained its principal place of business in this District, one or more of the individual defendants resides in or maintains executive offices in this District, a substantial portion of the

transactions complained of herein occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

<u>**PARTIES**</u>

<u>**Plaintiff**</u>

22.     Plaintiff Thomas Serafin currently owns 134 shares of Vereit common stock, and has held shares of common stock continuously since June 2014. Serafin is a citizen of New Jersey.

23.     Plaintiff Michele Graham Turner 1995 Revocable Trust, Jeffrey Turner as Trustee currently owns 500 shares of Vereit common stock, and has held shares of common stock continuously since June 2013. Turner is a citizen of Florida.

24.     Plaintiff Edward L. Froehner currently owns 76 shares of Vereit common stock, and has held shares of common stock continuously since October 2011. Froehner is a citizen of Texas.

<u>**Nominal Defendant**</u>

25.     Nominal Defendant Vereit is a publicly traded REIT organized under Maryland law. REITs own and operate income-producing real estate or other real estate-related assets. REITs provide investors with the ability to receive a share of the income produced through real estate ownership, without actually owning the underlying real estate. To qualify as a REIT, a company must, *inter alia*, have the bulk of its assets and income connected to real estate investments, and must distribute at least 90 percent of its taxable income to shareholders annually in the form of dividends.

26.     According to its public statements, at relevant times Vereit acquired, owned and operated single-tenant and multi-tenant real estate properties. Vereit's property portfolio was leased to corporate tenants. At relevant times, Vereit purported to focus on acquiring mid-term and long-term leases which provided for monthly income generation and "outsized" growth potential over the longer

term. At relevant times, Vereit was traded on NASDAQ Global Select Market, but now trades on the New York Stock Exchange. Vereit is a citizen of the States of Maryland and Arizona.

**Individual Defendants**

27.     Defendant Schorsch is the founder of ARCP. Schorsch resigned as Chief Executive Officer of ARCP on October 1, 2014, to be replaced by defendant Kay. On December 15, 2014, Schorsch "stepped down" as Executive Chairman of the Board.

28.     Schorsch's 2014 salary was $1.1 million. In 2014, the Compensation Committee awarded Schorsch an equity retention award valued at $24.8 million. Furthermore, pursuant to an executive "Multiyear Outperformance Plan" adopted by the Board's Compensation Committee in October 2013, Schorsch could have netted 42.5% of a bonus pool valued at $222.1 million over the next five years, or $94.4 million, depending on ARCP's operational performance.

29.     According to a Wall Street Journal article dated May 29, 2014, corporate governance watchdogs Institutional Shareholders Services Inc. ("ISS") and Glass, Lewis & Co. ("Glass Lewis") criticized Schorsch's compensation. According to an analyst with a compensation consultant FPL Associates, LP (as quoted in the May 29, 2014 article), "It's the highest pool that we've ever observed in the REIT space. It's definitely going to raise some eyebrows." According to ISS (as quoted in the May 29, 2014 article), the goals that the Company had to achieve for the program to pay out "do not seem rigorous relative to the potential payout values." According to Glass Lewis (as quoted in the May 29, 2014 article), "we are concerned that the various arrangements approved for executives in recent months appear to provide the Company's executives with outsized rewards, and the Company has provided a fairly limited explanation for these grants."   Furthermore, the Company's compensation plan was rejected by shareholders in a non-binding "say on pay" vote at the 2014 Annual Meeting.

30.     Schorsch signed the admittedly false and misleading SEC filings for the first and second quarters of fiscal year 2014, the Form 10-K for fiscal year 2013 that ARCP has since restated, and a myriad of other false SEC filings. Schorsch is a citizen of New York.

31.     Defendant Kay became a director in February 2014. He had been the President of ARCP since December 2013 until becoming CEO in October 2014. On December 15, 2014, Kay stepped down from all positions with the Company. Kay's 2014 salary was $600,000. In 2014, the Compensation Committee awarded Kay a $4.6 million cash retention award, a $15,000 signing bonus, and a $3.2 million equity retention award.  For fiscal year 2013, Kay received a cash bonus of $4.615 million and a stock award of $3.216 million. Kay signed the Form 10-K for fiscal year 2013 that ARCP has since restated. Kay is a citizen of New York.

32.     Defendant Block was the Company's CFO, Treasurer, Secretary and Executive Vice President. Block resigned from the Company in October 2014 in connection with the accounting restatement. Block signed the admittedly false and misleading first and second quarter fiscal year 2014 Forms 10-Q, and the Form 10-K for fiscal year 2013 that ARCP has since restated.

33.     Block has worked in Schorch's REIT businesses since at least 2007.  According to the Company's 2014 Proxy Statement, Block previously served as CFO and executive vice president of all of the non-traded investment programs sponsored by AR Capital, LLC until January 2014. Block served as a director of RCS since February 2013, and served as its CFO and treasurer from February 2013 until December 2013. In addition, Block was previously responsible for the accounting, finance and reporting functions at the entireAmerican Realty Capital group of companies. Block was "instrumental in developing the American Realty Capital group of companies' infrastructure and positioning the organization for growth." Block is a citizen of New York.

34.     Defendant McAlister was the Company's CAO and Senior Vice President. McAlister reportedly "resigned" from the Company in October 2014 in connection with the accounting restatement. McAlister signed the admittedly false and misleading second quarter fiscal year 2014 Form 10-Q, and the Form 10-K for fiscal year 2013 that ARCP has since restated. In her lawsuit against ARCP, McAlister admitted to signing false financial statements. McAlister is a citizen of New York.

35.     Defendant Beeson was the Company's President and COO. Beeson stepped down from her positions on December 15, 2014. For fiscal year 2013, Beeson received a $750,000 cash bonus and a stock award of over $732,000. Beeson signed the Form 10-K for fiscal year 2013 that ARCP has since restated. Beeson is a citizen of New York.

36.     Defendant Leslie D. Michelson ("Michelson") was a director of the Company from October 2012 through March 2015, and was a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee at relevant times. For fiscal year 2013, Michelson was paid $273,280 in cash and stock compensation. Michelson signed the Form 10-K for fiscal year 2013 that ARCP has since restated. Michelson is a citizen of New York.

37.     Defendant Edward G. Rendell ("Rendell") was a director of the Company from February 2013 through March 2015, and served as a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee at relevant times. For fiscal year 2013, Rendell was paid $202,272 in cash and stock compensation. Rendell signed the Form 10-K for fiscal year 2013 that ARCP has since restated, in addition to many other false SEC filings, as alleged herein. When the accounting fraud at ARCP was revealed, Rendell claimed that investors were "making a mountain out of a molehill." Rendell is a citizen of Pennsylvania.

38.     Defendant William G. Stanley ("Stanley") was a director of the Company from January

2014 through September 2015, and served as a member of the Board's Audit Committee, Compensation Committee, and Nominating and Governance Committee at relevant times. Stanley signed the Form 10-K for fiscal year 2013 that ARCP has since restated.

39.     On December 15, 2014, Stanley was appointed as "Interim Chief Executive Officer" and "Interim Chairman of the Board" following the departure of Schorsch and Kay. In these interim positions, Stanley was paid $150,000 per month. Corvex Management, LP ("Corvex"), a large shareholder of the Company, demanded an end to these "windfall payments" to Stanley, which "fly in the face of modern corporate governance, cause a horrible misalignment of incentives with shareholders, and create an environment ripe for quid pro quo relationships with incoming leadership."

40.     Stanley was formerly an officer or director with many Schorsch-related entities, including, at least, Business Development Corporation of America, Business Development Corporation of America II, American Realty Capital, Retail Centers of America, Inc., and New York REIT Inc., which executive positions he now claims to have resigned. Stanley is a citizen of New York.

41.     Defendant Scott J. Bowman ("Bowman") was a director of the Company from February 2013 through September 2014.  Bowman signed the Form 10-K for fiscal year 2013 that ARCP has since restated. Bowman was a member of the Audit Committee during the subject time periods. Bowman is a citizen of New York.

42.     All defendants are sometimes referred to as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

43.     By reason of their positions as officers, directors, and fiduciaries of ARCP, and because of their ability to control its affairs, each of the Individual Defendants owed ARCP and its

shareholders fiduciary duties of care and loyalty in the management and administration of ARCP's affairs, as well as in the use and preservation of ARCP's property and assets.  As such, they were required to act in furtherance of the best interests of ARCP and its shareholders, and were prohibited from engaging in self-dealing and unlawful corporate conduct, such as violations of the laws applicable to ARCP and its business.

44.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate complete, accurate, and truthful information regarding ARCP's business, finances, operations, management, and corporate conduct so that the market price of ARCP stock would be based on truthful and accurate information.

45.    The Individual Defendants, because of their positions as directors and/or officers of ARCP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  The misconduct of the Individual Defendants involves a culpable violation of their fiduciary obligations, the absence of good faith on their part, and a reckless disregard for the fiduciary duties they owed to ARCP and its shareholders, which they were aware of, or should have been aware of, posed a risk of serious injury to ARCP.

46.    According to its public statements, at relevant times ARCP expressed its "Corporate Responsibility" as follows:

**What We Stand For**

As is the case for all investment programs within the ARCP family of companies, the manner in which we create value for our stockholders defines who we at ARCP are, who we can be and who we will be.

Our company culture, which we consider to be the root of our success, is established on ethical values and a commitment to approaching every decision through the eyes of the investors we serve. We do this in the confidence that the more accountable we are to stockholders today, the better our business will be in the future.

This foundation guides all of our actions, policies and programs, including our corporate governance (led by an independent board of directors), fully transparent reporting, due diligence and regulatory compliance, and industry-leading best practice standards which are designed to protect the investor's best interest at all times. These duties are important to us because we know that how we do things is just as important as what we do.

This is how we demonstrate to our stockholders daily that ARCP is a partner they can trust.

47.    The Company also maintained at relevant times a Code of Ethics, which requires "honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company; compliance with applicable governmental rules and regulations; and accountability for adherence to this Code."

48.    The Code of Ethics further provided, in relevant part, as follows:

**Public Company Reporting**

As a public company, it is of critical importance that the Company's filings with the Securities and Exchange Commission (the "SEC") be accurate, timely and in accordance with all applicable laws and regulations. Depending on their position with the Company, an employee, officer or director may be called upon to provide necessary information to assure that the Company's public reports are complete, fair and understandable. The Company expects employees, officers and directors to take this responsibility very seriously and to provide prompt accurate answers to inquiries related to the Company's public disclosure requirements.

**Financial Statements and Other Records**

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the board of directors.

**Duty to Report**

Employees, officers and directors who suspect or know of violations of this Code or illegal or unethical business or workplace conduct by employees, officers or directors have a duty to report it immediately. Each person is encouraged to report such conduct to a supervisor or superior, but if the individuals to whom such information is conveyed are not responsive, or if there is reason to believe that reporting to such individuals is inappropriate in particular cases, then the employee, officer or director may contact the Chief Executive Officer of the Company. Such communications will be kept in confidence to the extent appropriate or permitted by law. If the employee is still not satisfied with the response, the employee may contact the Chief Executive Officer, the Chairman of the board of directors or any of the Company's outside directors. While employees, officers and directors are encouraged to use the Company's internal reporting system outlined, above, in all cases, employees, directors and officers may directly report such violations outside the Company to appropriate authorities in accordance with law.

The Company's policy is to comply with all applicable financial reporting and accounting regulations. If any director, officer or employee of the Company has unresolved concerns or complaints regarding questionable accounting or auditing matters of the Company, then he or she is encouraged to submit those concerns or complaints (anonymously, confidentially or otherwise) to the Company's audit committee or the Chief Financial Officer. Subject to its legal duties, the audit committee and the Chief Financial Officer will treat such submissions confidentially. Such submissions may be directed to the attention of the Company's audit committee, any director who is a member of the Company's audit committee or the Chief Financial Officer.

Each director, officer and employee who is involved in the Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC regulations. Each director, officer and employee who is involved in the Company's public disclosure process must: (a) be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and (b) take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

**Violations**

Violation of this Code is grounds for disciplinary action up to and including termination of employment. Such action is in addition to any civil or criminal liability which might be imposed by any court or regulatory agency.

15

49.     At all relevant times, the Company maintained an Audit Committee.  The purpose of the Company's Audit Committee was to:

1. oversee the accounting and financial reporting process of the Company and the audits of the financial statements of the Company;

2. appoint, retain and oversee the work of any independent registered public accounting firm engaged by the Company for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company (the "Independent Auditor"), and determine the compensation of the Independent Auditor; and

3. monitor the integrity of the Company's financial statements, the Independent Auditor's qualifications and independence, the performance of the Company's internal audit function, the Company's compliance with legal and regulatory requirements and the Company's overall risk profile.

50.     The defendants who served on the Audit Committee during relevant times - Michelson, Rendell, Bowman, and Stanley - had a special relationship with the Company. Under the Audit Committee Charter, they were required to oversee the accounting and financial reporting process and the audits of the financial statements of the Company, and to monitor the integrity of the Company's financial statements, the performance of the Company's internal audit function, the Company's compliance with legal and regulatory requirements, and the Company's overall risk profile.

51.     In addition, according to the Audit Committee Charter, these directors "shall review and discuss the quarterly financial statements with management and the Independent Auditor." Furthermore, the Audit Committee directors shall discuss with management and the outside auditor the Company's earnings press releases (with particular focus on any "pro forma" or "adjusted" and other non- GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

52.     In sum, the Individual Defendants led the Company's shareholders to believe they could be trusted.  However, the Individual Defendants have shown otherwise due to "intentional"

accounting and disclosure discrepancies.  At all relevant times, each Individual Defendant was the agent of each other and of ARCP, and was acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

53.    At relevant times, ARCP was a self-managed real estate company that acquired, owned and operated single-tenant, free-standing commercial real estate properties primarily subject to net leases with high credit quality tenants. The Company invested in properties that are net leased to (a) creditworthy tenants, which are generally large public companies with investment-grade ratings and other types of creditworthy tenants, and (b) governmental, quasi-governmental and not-for-profit entities.

54.    The Company's long-term business strategy has been to acquire a diverse lease portfolio consisting of approximately 70% long-term leases and 30% medium-term leases, with an average remaining lease term of 10 to 12 years. This strategy is designed to provide for stable income from creditworthy tenants and growth opportunities from re-leasing of below market leases.

55.    ARCP went public on September 7, 2011, raising approximately $70 million through the sale of over 5.5 million shares at $12.50 per share. As of December 31, 2011, the Company had total assets of $132 million. By December 31, 2012, the value of the Company's assets had almost doubled to $256 million. In early 2013, the Company embarked on a major acquisition spree.

56.    For example, between February 2013 and July 2014, the Company acquired various REITs and assets, including ARCT III for $2.2 billion, CapLease, Inc. for $2.2 billion, ARC IV for $3 billion, 500 Red Lobster restaurant locations for $1.5 billion, and Cole, Inc. for $11.2 billion.

57.    By mid 2014, the value of the Company's assets had skyrocketed to about $21 billion, making it the largest REIT of its kind in the United States. ARCP often touted its acquisition practices.

According to defendant Kay in a February 27, 2014 earnings release, ARCP's acquisitions were "a testimony to the efficiency and effectiveness of our acquisition machine."

58.    As of June 30, 2014, the Company owned 3,966 properties, comprising 106.8 million square feet of single and multi-tenant retail and commercial space, located in 49 states, which included properties owned through consolidated joint ventures. As of June 30, 2014, the rentable space at these properties was 98.8% leased, with a weighted average remaining lease term of 9.95 years. As of June 30, 2014, the Company also owned 25 commercial mortgage-backed securities, 14 loans held for investment, and had interests in six properties comprising 1.6 million rentable square feet.

59.    According to its public filings, ARCP's primary business objective was to generate dependable monthly cash dividends from a consistent and predictable level of funds from operations ("FFO") and AFFO per share, as well as capital appreciation associated with extending expiring leases or repositioning its properties for lease to new credit worthy tenants upon expiration.

60.    According to the Company, FFO and AFFO were the prime indicators of the performance of a REIT. These calculations exclude such factors as depreciation and amortization of real estate assets, and gains or losses from sales of operating real estate assets, and facilitated comparisons of operating performance between time periods and between other REITs in the Company's peer group.

61.    According to the Company, accounting for real estate assets in accordance with Generally Accepted Accounting Principles ("GAAP") implicitly assumed that the value of real estate assets diminishes predictably over time. According to the Company, many industry investors and analysts have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves.

62.    At all relevant times, ARCP was controlled by Schorsch, who as its Executive

18

Chairman was responsible for "strategic company oversight." ARCP was one part of a vast network of real estate and investment companies created by Schorsch for the purpose of creating REITs, providing research and advisory services to these entities, and selling REIT investments to retail investors. As described in a December 19, 2014 Forbes.com article:

> Schorsch became a billionaire by constructing a complex web of interrelated companies–at one point he was CEO of more than a dozen companies. He raised money for his nontraded REITs, took them public, and then used those vehicles to buy out his own other nontraded REITs.  His fully integrated operation not only manufactured nontraded, high-yielding REITs, it also provided research and advisory services to them, and controlled the second-largest independent financial advisory operation in the nation (9,200 brokers) who peddled them.

63.     A November 5, 2014 Wall Street Journal Article entitled "For Schorsch, an Empire Under Siege" described Schorsch's companies as "a tangle of like-sounding names such as American Realty Capital Global Trust II and American Realty Capital Healthcare Trust III" that have "raised $20.8 billion over the past seven years from small investors, the most of any real-estate company . . . . The companies use the money to buy properties ranging from nursing homes to FedEx Corp. distribution centers. The goal is to flip properties quickly at a profit to repay investors and build a strong track record in hopes of collecting still more money from them."

64.     An accompanying illustration in the November 5, 2014 Wall Street Journal article depicts Schorsch's business model as follows:



A Mogul's Property Model

Nicholas Schorsch runs more than 20 real-estate and alternative-investing companies, many of them interrelated and with overlapping management teams.

New York REIT
Publicly traded

Chairman, CEO

Chairman

RCS Capital
Publicly traded

'Mom and pop' investors

Nicholas Schorsch

Sells shares in nontraded REITs sponsored by AR Capital via financial advisers like LPL Financial, Cetera Financial Group, First Allied to 'mom and pop' investors

Chairman

American Realty Capital Properties
Publicly traded company that disclosed accounting irregularities

Chairman, CEO

AR Capital
Privately held

Owns

Cole Capital Advisors

Advises and sells shares of nontraded REITs

Cole Credit Property Trust
Cole Office & Industrial REIT
Cole Real Estate Income Strategy

Has sponsored nontraded REITs in the past, including:

ARC III
ARC IV

Sponsors nontraded REITs, business development corporations and other partnerships

Open offerings include
American Energy Capital Partners
American Realty Capital - Retail Centers of America II
American Realty Capital Daily Net Asset Value Trust
American Realty Capital Global Trust II
American Realty Capital Healthcare Trust II
American Realty Capital Healthcare III
American Realty Capital Hospitality Trust
American Realty Capital New York City REIT
ARC Realty Finance Trust
Business Development Corporation of America
Business Development Corporation of America II
Phillips Edison - ARC Grocery Center REIT II

Source: the companies, securities filings and Robert A. Stanger & Co.   Photo: Keith Bedford for The Wall Street Journal

The Wall Street Journal

65.    ARCP's business model of rapid growth through acquisitions frequently resulted in large transactions between companies owned and controlled by Schorsch. Schorsch's empire was specifically constructed to facilitate the funnelling of massive transaction fees to Schorsch and his allies from deals by and among a confusing web of like-sounding businesses entities. As stated in the November 5, 2014 Wall Street Journal article, "often the deals involve selling properties to other companies in Mr. Schorsch's empire, each time racking up fees for Mr. Schorsch and his management team. When American Realty Capital Properties bought ARC-IV, a large nontraded REIT sponsored

by Mr. Schorsch, in 2013, the prospectus listed a $62.7 million payment to the owners of ARC-IV's advisory company, which at the time was controlled by Mr. Schorsch."

66.     Similarly, when the Company purchased Cole, Inc. in early 2014, an entity related to Schorsch named Realty Capital Securities, LLC was paid $28 million in fees for "financial advisory and strategic services" provided to the Company in connection with the merger.

67.     To fuel its acquisitions and Schorsch's fees, the Company raised billions in numerous securities offerings during the relevant period, including (a) $300 million in 3% Convertible Senior Notes due 2018, in July 2013 ("July 2013 Offering"); (b) $287.5 million in 3% Convertible Notes due 2018, in December 2013 ("December 2013 3% Offering"); (c) $402.5 million in 3.75% Convertible Senior Notes due 2020, in December 2013 ("December 2013 3.75% Notes Offering"); (d) 79.1 million shares of stock issued in connection with the ARC-IV merger, in January 2014 ("January 2014 Offering"); (e) 520.8 million shares of stock issued in connection with the Cole merger, in February 2014 ("February 2014 Cole Offering"); (f) 138 million shares of stock, in May 2014 ("May 2014 Offering"); and (g) $2.55 billion of Senior Notes, in September 2014 ("September 2014 Offering").

68.     ARCP's rapid growth previously caused concerns regarding its internal controls and the accuracy of its financial statements. For example, in June of 2014, a large shareholder, Marcato Capital Management, LP ("Marcato"), wrote a letter to defendant Michelson, in his capacity as lead independent director, putting the Board on notice of ARCP's prior errors in SEC reporting:

> ARCP's rapid acquisitions of CapLease, ARCT IV, and Cole, followed by the recent purchase of the Red Lobster portfolio, sale of the multi-tenant retail portfolio, and equity issuance, have made the Company's financials complicated and difficult to understand. So many moving pieces make the Company challenging for investors and analysts to model. Indeed, we believe the best evidence of this is that the Company itself seemingly cannot keep its own financials straight. On May 20th, in an 8-K filing in which it attempted to show its Pro Forma first quarter financial statements, the Company used an inaccurate share count; as a result, **it was forced to file an amendment telling the market to disregard the previous filing**, and a subsequent 8-K with new Pro Forma

financials.  ARCP's shares sold off on news of the inaccurate 8-K, and have yet to substantially recover. . . .   [emphasis supplied].

It certainly did not help that the Company then **made another mistake in its filings**.  In the prospectus for its recent equity issuance, the Company stated the fees associated with the Red Lobster transaction were $108 million.  On May 29th, the Company put out an 8-K disclosing that the fees were actually $10.8 million, and it had initially overstated the figure by a factor of 10.  **While we are relieved to know that the Company did not spend $108 million in fees to close a $1.5 billion portfolio acquisition, we are alarmed by what appear to be disorderly financial controls exposed by the Company's second material disclosure error in as many weeks.** [emphasis supplied]**.**

We believe the existence of these errors is symptomatic of the larger problem: The Company is engaging in too many transformative transactions too quickly.

B.    <u>False Statements For Fiscal Years 2011, 2012, 2013 and 2014</u>

69.    On March 19, 2012, the Company filed a Form 10-K with the SEC disclosing its financial results, including AFFO, for the third and fourth quarters of 2011, its first two quarters as a public company. The 2011 Form 10-K emphasized the significance of AFFO, stating:

By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs. As a result, we believe that the use of FFO and AFFO, together with the required GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.

70.    The 2011 Form 10-K reported AFFO of $287,000 for the third quarter of 2011 and $1,491,000 for the fourth quarter of 2011. Schorsch and Block each executed certifications pursuant to the federal securities laws attesting to the truth and accuracy of the 2011 Form 10-K.

71.    The Form 10-K also represented that:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as

22

of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

72.     The 2011 Form 10-K was signed by defendants Schorsch, Block, and Rendell. As revealed by the Company on March 2, 2015, the AFFO figures reported in the fiscal year 2011 Form 10-K were false. In particular, AFFO was overstated. Furthermore, the Company's March 2, 2015 announcement confirmed that the disclosures in the 2011 Form 10-K regarding the adequacy of the Company's internal controls were also false.

73.     On February 28, 2013, the Company filed a Form 10-K with the SEC disclosing its financial results, including AFFO, for fiscal year 2012. The 2012 Form 10-K emphasized the significance of AFFO, stating:

> We consider FFO and FFO, as adjusted to exclude acquisition-related fees and expenses, or AFFO, useful indicators of the performance of a REIT. Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful-life estimates), they facilitate comparisons of operating performance between periods and between other REITs in our peer group. Accounting for real estate assets in accordance with U.S. GAAP implicitly assumes that the value of real estate assets diminishes predictably over time. Since real estate values have historically risen or fallen with market conditions, many industry investors and analysts have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves.

> Additionally, we believe that AFFO, by excluding acquisition-related fees and expenses, provides information consistent with management's analysis of the operating performance of the properties. By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our operating performance. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies, including exchange-traded and non-traded REITs.

As a result, we believe that the use of FFO and AFFO, together with the required U.S. GAAP presentations, provide a more complete understanding of our performance relative to our peers and a more informed and appropriate basis on which to make decisions involving operating, financing, and investing activities.

74.     The 2012 Form 10-K reported total fiscal year AFFO of approximately $10.4 million. Schorsch and Block each executed certifications pursuant to the federal securities laws attesting to the truth and accuracy of the 2012 Form 10-K. The 2012 Form 10-K also represented that:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

75.     The 2012 Form 10-K was signed by defendants Schorsch, Block and Michelson.  As revealed by the Company on March 2, 2015, the AFFO figures reported in the fiscal year 2012 Form 10-K were false. In particular, AFFO was overstated. Furthermore, the Company's March 2, 2015 announcement confirmed that the disclosures in the 2011 Form 10-K regarding the adequacy of the Company's internal controls were also false.

76.     On February 27, 2014, the Company filed a Form 10-K with the SEC disclosing its financial results, including AFFO, for fiscal year 2013. The 2013 Form 10-K emphasized the significance of AFFO, stating:

We consider FFO and AFFO useful indicators of the performance of a REIT. Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful-life estimates), they facilitate comparisons of operating performance between periods and between other REITs in our peer group. Accounting for real estate assets in accordance with U.S. GAAP implicitly assumes that the value of real estate assets diminishes predictably over time.

Since real estate values have historically risen or fallen with market conditions, many industry investors and analysts have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves.

We exclude certain income or expense items from AFFO that we consider more reflective of investing activities, other non-cash income and expense items and the income and expense effects of other activities that are not a fundamental attribute of our business plan. These items include unrealized gains and losses, which may not ultimately be realized, such as gains or losses on derivative instruments, gains or losses on contingent valuation rights, gains and losses on investments and early extinguishment of debt. In addition, by excluding non-cash income and expense items such as amortization of above and below market leases, amortization of deferred financing costs, straight-line rent and non-cash equity compensation from AFFO we believe we provide useful information regarding income and expense items which have no cash impact and do not provide us liquidity or require our capital resources. By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties. We also believe that AFFO is a recognized measure of sustainable operating performance by the REIT industry. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved in activities which are excluded from our calculation.

77.    The 2013 Form 10-K reported total fiscal year AFFO of $163.9 million and a net loss of approximately $406 million. Schorsch and Block each executed certifications pursuant to the federal securities laws attesting to the truth and accuracy of the 2013 Form 10-K. The 2013 Form 10-K also represented that:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

78.     The 2013 Form 10-K was signed by defendants Schorsch, Block, McAlister, Beeson, Kay, Michelson, Stanley, and Rendell. As revealed by the Company on March 2, 2015, the AFFO figures *and* net income reported in the fiscal year 2013 Form 10-K were false. In particular, AFFO was overstated and net income (for each fiscal quarter) was understated. Furthermore, the Company's March 2, 2015 announcement confirmed that the disclosures in the 2013 Form 10-K regarding the adequacy of the Company's internal controls were also false.

79.     On May 8, 2014, the Company announced its operating results for the first quarter of fiscal year 2014, ended March 31, 2014. The press release stated in part:

Selected operating highlights for the quarter include:

**Increased Revenue**: Increased revenue to a record $320.6 million, up 647.4% compared to the same period a year earlier.

**Increased AFFO**: Increased AFFO available to common stockholders to $147.4 million, up 334.6% compared to the same period a year earlier.

**Balance Sheet Acquisitions**: Completed $1.03 billion of acquisitions on the balance sheet, comprised of 224 properties in 78 individual transactions at an average cap rate of 8.24% (8.02% cash cap rate), with another over $700 million already closed or under contract for the second quarter.

**Cole Capital Acquisitions**: Acquired $419.9 million of real estate assets on behalf of the managed funds in the first quarter, comprising 84 properties in 51 individual transactions.

**Cole Capital**: On track to raise $3.1 billion in 2014: Raised $897 million of capital on behalf of the managed funds in the first quarter.

**Investment Grade Balance Sheet**: Secured investment grade rating from S&P and received a reaffirmation of investment grade from Moody's.

**Multi-Tenant Spin-off**: Announced spin-off of American Realty Capital Centers, Inc. (NASDAQ: ARCM) ("ARCM") which is expected to be completed by mid-June.

80.     According to the May 8, 2014 press release, defendants Schorsch and Kay were highly positive about the Company's prospects for fiscal year 2014, including its aggressive acquisition activities. The press release stated in relevant part:

"I am very pleased with our results for the first quarter of the year," said Nicholas S. Schorsch, Chief Executive Officer and Executive Chairman of

ARCP. "We had a record quarter with earnings coming exactly in line with our expectations of $0.26 AFFO per share, consistent with our previously stated guidance for the year. Additionally, our year-to-date acquisitions, combined with properties currently under contract puts us well-ahead of schedule to achieve our total 2014 annual acquisition targets by midyear. With our strengthened balance sheet, and the Company ready to capitalize on a number of large-scale sale- leaseback transactions, we are in position to deliver strong shareholder return this year. The management team is working cohesively and my plan for succession as Chairman is advancing as anticipated."

"With our acquisitions team firing on all cylinders, every aspect of our business is exceeding our expectations," said David S. Kay, President of ARCP. "With strong earnings, our acquisition volume is outpacing our guidance, our cap rates surpass all industry peers, Cole Capital launched two new products, and we successfully integrated our management and systems, all of which is allowing us to execute with a disciplined intensity. The $1.7 billion of acquisitions we have closed or placed under contract were at a 7.92% cash cap rate or 8.26% GAAP cap rate. These 150 self-originated transactions are indicative of the scale and expertise of our platform, providing a significant competitive advantage. Finally, we are ramping up our capital raising initiatives in May and remain confident that we will achieve our target of raising $3.1 billion of capital during 2014."

81.     According to the May 8, 2014 press release, AFFO for the first quarter totaled $147.4 million, or $0.26 per fully diluted share. On May 8, 2014, the Company filed a Form 10-Q with the SEC repeating these reported results. This Form 10-Q was signed by defendants Schorsch and Block. Defendants Schorsch and Block certified that the financial statements were accurate, and that the Company's internal controls were sufficient:

In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

82.     As revealed on October 29, 2014, and further detailed in the March 2, 2015 announcement, the financial results reported in the first quarter 2014 press release and the corresponding SEC filing were false. In particular, AFFO was materially overstated. Furthermore, the

Company's March 2, 2015 announcement confirmed that the disclosures made in the first quarter

2014 Form 10-Q regarding the adequacy of the Company's internal controls were also false.

83.     On July 29, 2014, the Company announced its operating results for the second quarter

of fiscal year 2014, ended June 30, 2014. The press release stated in part:

Selected operating highlights for the quarter include:

**Increased Revenues:** Increased revenues to $382.0 million, up 595.2% compared to the same period a year earlier.

**Increased AFFO:** Increased AFFO to $205.3 million, up 429.0% compared to the same period a year earlier, and increased AFFO per share to $0.24, up 26% compared to the same period a year earlier.

**Pro Forma AFFO Run Rate:** Pro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18 - $1.20 per share including 2014 completed and announced transactions. This AFFO estimate does not include any balance sheet acquisitions in excess of our $4.5 billion 2014 guidance, no dispositions, no rent growth or G&A synergies for 2015 and assumes results for Cole Capital consistent with the Company's 2014 projection.

**Acquisitions:** Completed $834.7 million of net lease acquisitions on the balance sheet and an additional $751.1 million of real estate assets on behalf of the Cole Capital managed funds.

**Dispositions:** Sold eight properties for total net proceeds of $40.8 million, for a year--to--date total of 25 properties sold for $96.4 million.

**Cole Capital Equity Raise:** Raised $161.0 million of capital on behalf of the managed REITs in the second quarter and $1.1 billion year-to-date as of June 30, 2014.

**De-levered and Refinanced Debt:** Refinanced $282.2 million in Q2 with an average maturity of 1.9 years and a weighted average interest rate of 3.5%; $1.0 billion refinanced year-to-date as of June 30, 2014 with an average maturity of 2.0 years and a weighted average interest rate of 4.7%. Pro forma net debt annualized adjusted EBITDA as of June 30, 2014 is 6.3x.

**Improved Corporate Governance:** Terminated our investment relationship with RCS Capital; took steps to eliminate independent directors' presence on the boards of any non-traded real estate investment trusts sponsored by AR Capital, LLC ("ARC"); enhanced intellectual diversity and leadership by expanding our Board in 2014 with four new members including William Stanley, Thomas Andruskevich, Bruce Frank and David Kay (Mr. Kay's appointment effective October 1) and establishing plans to add an additional independent director by year-end. In addition, our directors will opt-out of the Maryland Unsolicited Takeover Act ("MUTA") allowing our stockholders the right to elect our

entire Board of Directors at each annual meeting. Further governance and compensation changes are described below.

84. According to the July 29, 2014 press release, defendant Kay was again highly positive about the Company's performance. The press release stated in relevant part:

**President's Comments on Operating Results**

"Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments as outlined in our June 20th stockholder letter," said David S. Kay, President of ARCP. "In six months, we have fully integrated the organization, achieved $38.0 million of the $77.0 million of cost synergies to come in the first year, reduced leverage, de-risked the balance sheet, lengthened debt maturities, created $11.8 billion of unencumbered assets and significantly extended and upsized our credit facility. With these actions undertaken and the formative stage of the company behind us, we are focused on the day-to-day operations of the company. Through all of these undertakings, we are positioned for long-term success."

"Our balance sheet acquisitions in the quarter, owned and under contract, of 1,217 properties in over 210 separate transactions demonstrates the continuing systematic execution of our core acquisition strategy and testifies to the repeatability of our investment process. As always, we see a tremendous volume of deals, but with only approximately $250 million of acquisitions remaining to transact in calendar year 2014 on the balance sheet to meet our previously announced $4.5 billion target, we intend to maintain a highly disciplined and selective approach to purchase the best assets for the portfolio. Our real estate team remains able to self-originate and close transactions in a timely manner – both at a granular level and for large-scale sale-leasebacks. This enables us to achieve superior pricing. Moreover, by routinely culling through the existing portfolio, we are identifying further opportunities that can be realized by harvesting capital derived from non-core assets and re-deploying that capital in an accretive manner. At the same time, we are thoughtfully managing our debt portfolio by lengthening debt maturities and taking advantage of the current rate environment. The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders."

85. In addition, defendant Schorsch sought to burnish the Company's corporate governance practices and his own personal role in developing them:

**Chairman's Comments on Corporate Governance**

"As I outlined in yesterday's stockholder letter, I have continued to focus my attention on improving corporate governance," said Nicholas S. Schorsch, Chairman and CEO of ARCP. "With the support of our Board of Directors, we are improving our practices by eliminating related party transactions, enhancing disclosures, evaluating executive compensation, opting out of the MUTA to assure our stockholders' right to elect the entire Board at each annual meeting, and implementing other policies designed to improve our reporting and transparency, further align interest with our stockholders, and eliminate potential conflicts of interest. Our goal is to constantly improve our corporate governance, which we expect will ultimately be reflected in our corporate governance scores. All of these efforts are taken with a view toward creating long-term value for stockholders."

86.     According to the press release, AFFO for the second quarter totaled $205.3 million, or $0.24 per fully diluted share. On July 29, 2014, the Company filed a Form 10-Q with the SEC repeating these reported results. This Form 10-Q was signed by defendants Schorsch, Block and McAlister. Defendants Schorsch and Block further certified that the financial statements were accurate, and that the Company's internal controls were sufficient:

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

87.     As revealed by the Company on October 29, 2014, and as further detailed in the March 2, 2015 announcement, the financial results reported in the second quarter 2014 press release and the corresponding SEC filing were false. In particular, AFFO was overstated and net income was understated. Furthermore, the Company's March 2, 2015 announcement confirmed that the disclosures in the second quarter 2014 Form 10-Q regarding the purported adequacy of the Company's internal controls were also false.

30

88.     In addition, the foregoing false financial results and misrepresentations regarding the adequacy of the Company's internal controls were included with or incorporated into the SEC filings for Company's numerous securities offerings during 2013 and 2014.

89.     The offering materials for these offerings were signed by the named defendants herein. Specifically, the registration statement for the July 2013 Offering was signed by defendants Schorsch, Block, Michelson, Rendell and Bowman. The registration statement for the December 2013 3% Notes Offering was signed by defendants Schorsch, Block, Michelson, Rendell and Bowman. The registration statement for the December 2013 3.75% Note Offering was signed by defendants Schorsch, Block, Michelson, Rendell, and Bowman. The registration statement for the January 2014 Offering was signed by defendants Schorsch, Michelson, Rendell, Bowman, Block and Beeson. The registration statement for the February 2014 Offering was signed by defendants Schorsch, Weil, Michelson, Rendell, Bowman, Block and Beeson. The registration statement for the May 2014 Offering was signed by defendants Schorsch, Stanley, Michelson, Rendell, Bowman and Block. The registration for the September 2014 Offering was signed by defendants Schorsch, Stanley, Andruskevich, Michelson, Rendell, Bowman, Block and McAlister.

## C.     The October 29, 2014 Revelations

90.     Since the beginning of 2014, the Company's financial performance had surged and the Company had tripled in size, from $7.8 billion to in excess of $20 billion as of October 2014. The momentum stopped on October 29, 2014, when the Company shocked its shareholders by announcing "errors" in its financial statements and "changes in accounting personnel."

91.     According to an October 29, 2014 Form 8-K filing:

**Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On October 24, 2014, the Audit Committee of the Board of Directors (the "Audit

Committee") of American Realty Capital Properties, Inc. (the "Company") concluded that the previously issued audited consolidated financial statements and other financial information contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, the previously issued unaudited financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal periods ended March 31, 2014 and June 30, 2014, and the Company's earnings releases and other financial communications for these periods (collectively, the "Prior Financial Information") should no longer be relied upon.

The Audit Committee based its conclusion on the preliminary findings of its investigation into concerns regarding accounting practices and other matters that first were reported to the Audit Committee on September 7, 2014. The Audit Committee promptly initiated an investigation, which is being conducted with the assistance of independent counsel and forensic experts.

The investigation conducted to date has not uncovered any errors in the consolidated financial statements (prepared in accordance with U.S. GAAP) for the three months ended March 31, 2014. However, based on the preliminary findings of the investigation, the Audit Committee believes that the Company incorrectly included certain amounts related to its non-controlling interests in the calculation of adjusted funds from operations ("AFFO"), a non-U.S. GAAP financial measure, for the three months ended March 31, 2014 and, as a result, overstated AFFO for this period. **The Audit Committee believes that this error was identified but intentionally not corrected, and other AFFO and financial statement errors were intentionally made, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014.**

As discussed in Item 5.02 of this Current Report on Form 8-K, at the request of the Audit Committee, **the Company's Chief Financial Officer and Chief Accounting Officer have resigned**.

Nothing has come to the attention of the Audit Committee that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2013. However, **the Audit Committee has expanded its investigation to encompass the Company's audited consolidated financial statements for the fiscal year ended December 31, 2013 in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements.**

Based on the preliminary findings of the investigation, the Company has identified the potential adjustments set forth in Exhibit 99.1 to this Report to the Company's reported net loss in accordance with U.S. GAAP for the three and six

months ended June 30, 2014 and to reported AFFO (a non-U.S. GAAP financial measure described in Exhibit 99.1) for the three months ended March 31, 2014 and the three and six months ended June 30, 2014. Note that, in calculating AFFO for the first quarter of 2014, the Company presented activity from non-controlling interests on a net basis, while in the second quarter of 2014, as permitted, the Company presented its activity from non-controlling interests on a gross basis (which it will continue to do in calculating AFFO in future periods). The weighted average number of shares used in calculating AFFO differs depending on whether the net or gross method is used (but does not change for purposes of calculating net loss per share in accordance with U.S. GAAP). **The investigation is ongoing and there can be no assurance that the potential adjustments set forth in the table below will not change based upon the final results of the investigation, and any such change could be material.**

The Company will work with the Audit Committee and the Audit Committee's independent advisors to determine the adjustments required to be made to the Prior Financial Information as expeditiously as possible. Upon the completion of this process, which could identify further adjustments in addition to those discussed above, the Company will restate the Prior Financial Information and amend its prior periodic filings to the extent required. The Company will file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 after the amended filings have been made.

In light of the preliminary findings of the Audit Committee's investigation, the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures. The Company intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process.

[emphasis added].

92.   According to a press release dated October 29, 2014, AFFO for the first quarter 2014 was restated down from $147,780,000 to $135,806,000, AFFO for the second quarter was restated down from $205,278,000 to $194,409,000, and AFFO for the first six months of 2014 was restated down from $353,058,000 to $330,215,000, a total of $23 million. On a per share basis, AFFO for the first six months of fiscal year 2014 was restated down from $0.49 to $0.45.

93.   Thus, the Company acknowledged that, for fiscal year 2014, the "intentional" acts of fraud caused: AFFO for the first quarter to be overstated by 13.6%;  AFFO per-share for the first quarter to be overstated by 13.0%; net loss attributable to the Company (on a U.S. GAAP basis) for

the second quarter to be understated by 18.6%; loss-per-share (on a U.S. GAAP basis) for the second

quarter to be understated by 11.1%; AFFO for the second quarter to be overstated by 5.6%; and AFFO

for the six months ended June 30, 2014 to be overstated by 6.9%.

94.      Notwithstanding revelations of fraud at the highest levels of the Company, the Audit

Committee and the Board (which included Schorsch and Kay) used the opportunity to voice their

unwavering support for the management team: *i.e.*, Schorsch and Kay:

> Although the Board is disappointed in these developments, ***the Board has full confidence in the management team and staff***.  The Audit Committee, Board and management team are fully committed to resolving this matter in an expedited and thorough manner.  ***The Board continues to support management's efforts*** surrounding the simplification of the business, enhancements in transparency, and improvements to the predictability of our earnings, all with the goal of enhancing long-term value.

> [emphasis added].

95.      In addition to standing firmly behind Schorsch and Kay, the Form 8-K and the October

29, 2014 press release pinned the blame squarely on Block (the CFO) and McAlister (the CAO) by

announcing that they had "resigned." The October 29, 2014 press release drew further attention to

Block and McAlister (and away from anyone else) by stating that the Audit Committee would

investigate *other* financial reports for which Block and McAlister had been responsible:

> The Audit Committee has indicated that nothing has come to its attention that leads it to believe that there are any errors in the Company's previously issued audited consolidated financial statements for the fiscal year ended December 31, 2013 contained in the Company's 2013 Form 10-K. However, the Audit Committee has expanded its investigation to encompass the Company's audited financial statements for this period **in light of the fact that the Company's former Chief Financial Officer and former Chief Accounting Officer had key roles in the preparation of those financial statements**.

> [emphasis added].

96.      Following these disclosures, ARCP's share price plummeted approximately 30%

intraday before closing down 20% from $12.45 per share to approximately $10 per share, erasing

billions in shareholder value. In a subsequent conference call to discuss these results, defendant Kay revealed that although the first-quarter results were overstated as the result of a purported "error," the second-quarter results were based on a calculation made "in order to conceal the error from the first quarter." Defendant Kay downplayed the situation and sought to attribute the manipulations to "bad judgment." According to defendant Kay, "this isn't the ideal situation, but I think that it is not the parade of horribles that the market may view this as today . . . . We have an exceptional team that runs this company. It is an ethical team. We are striving to be better every single day."

97.     More adverse consequences followed. According to an article entitled "SEC to Open Inquiry into American Realty Capital's Accounting" dated October 29, 2014:

> One of the largest U.S. real-estate empires was battered Wednesday by its disclosure of an accounting mistake and subsequent coverup that forced the resignations of two top executives, slashed its flagship company's stock-market value by 19% and sparked a regulatory probe.

> American Realty Capital Properties Inc., the primary holding of property mogul Nicholas Schorsch, said in a securities filing that it asked its chief financial officer and chief accounting officer to resign after determining the company had overstated a measure of income in the first quarter, and that the executives chose not to correct the error in the second quarter. Shares of three other companies overseen by Mr. Schorsch also fell.

> The Securities and Exchange Commission intends to launch an inquiry into the accounting irregularities, according to a person familiar with the matter.

> The revelation is a black eye for Mr. Schorsch, chairman of American Realty Capital and one of the biggest real-estate investors in the U.S. The college dropout and son of a scrapyard owner in recent years embarked on an acquisition spree that fueled one of the swiftest rises in the real-estate world.

> * * *

> Standard & Poor's on Wednesday placed American Realty Capital's triple-B-minus credit rating, which is one notch above so-called junk status, on watch for possible downgrade.

The accounting incident sent shock waves through the real-estate industry, where Mr. Schorsch has raised tens of billions of dollars in recent years, much of it from individual investors.

* * *

Mr. Block didn't respond to requests for comment. A spokeswoman for Grant Thornton LLP, American Realty's auditor, declined to comment. Ms. McAlister couldn't be reached for comment.

* * *

Analysts suggested it was too soon to assess the damage to the company or Mr. Schorsch's broader empire. Some investors "may throw in the towel on today's news, as accounting missteps take a while to sort out," Paul Adornato, a REIT analyst with BMO Capital Markets, said in a client note. "Confidence takes longer to return, if ever."

Others said the errors could directly undermine American Realty Capital's growth strategy, which has relied on tapping the debt and equity markets for capital to pay for acquisitions.

The company's "credibility is likely impugned for some period of time," wrote J.P. Morgan analyst Anthony Paolone, adding that "capital costs will be higher in the near term…thus making growth more difficult."

Investors also are worried the timing of the accounting revelations could imperil a deal that American Realty Capital announced earlier this month, according to a person familiar with the matter. On Oct. 1, the company said that it would sell its private capital-management business, Cole Capital, which raises money for nontraded REITs, for $700 million to RCS Capital Corp., another company chaired by Mr. Schorsch.

98.    According to a Wall Street Journal article dated November 3, 2014, and entitled "FBI Opens Criminal Probe Into American Realty Capital Amid Accounting Meltdown," an FBI investigation was promptly opened in addition to the SEC inquiry. Meanwhile, following the October 29, 2014 revelations, at least two financial services firms, LPL Financial and AIG Advisors Group, indefinitely suspended sales of ARCP's REIT investment products to their clients.

99.    On November 3, 2014, it was announced that RCS's board of directors had decided to terminate its proposed $700 million deal to purchase certain business divisions from ARCP "in light

of the disclosures made by ARCP." According to RCS, "by doing so, [RCS] has moved swiftly and decisively to protect its franchise, the interests of its shareholders and the ongoing prospects and continuing enterprise value of the company and its subsidiaries." ARCP later sued RCS for backing out of the deal, and the parties reached a $60 million settlement.

100. According to a Bloomberg article entitled "American Realty Accounting Errors Roil Real Estate Empire" dated November 5, 2015:

> The accounting scandal at American Realty Capital Properties Inc. (ARCP) is threatening to upend a real estate empire built by Nicholas Schorsch in an industry where reputation propels growth.

> The disclosure last week that accounting errors were intentionally concealed at the real estate investment trust, leading to the resignation of two executives, has erased almost $4 billion in market value, sparked an FBI investigation and a review by the Securities and Exchange Commission. It also is leading some brokers to halt sales tied to Schorsch's AR Capital LLC, the biggest sponsor of nontraded REITs.

> The accounting mistakes are weighing on other parts of the web of companies created by Schorsch, the 53-year-old chairman of New York-based American Realty Capital Properties and its chief executive officer until last month. The REIT now faces the challenge of regaining investors' trust, as does AR Capital, which uses brokers to sell shares to individual investors who only need Google to find the recent travails.

> "*It's the intentional nature of the error*" *that raises concern*, said Kevin Gannon, president and managing director at Robert A. Stanger & Co., a Shrewsbury, New Jersey-based investment bank that compiles data on nontraded REITs. "*This industry is all about credibility. People will raise money for you but they have to be confident that you're a straight shooter. We hope they demonstrate that this is an isolated incident.*"

> ***

> RCS Capital

> Another Schorsch company, RCS Capital Corp. (RCAP), is an investment firm with businesses including raising money for AR Capital and other nontraded REITs. That company -- whose shares have plunged more than 40 percent since the news of the accounting issues on Oct. 29 -- this week pulled out of a deal to buy American Realty Capital Properties's Cole Capital private-capital management unit.

RCS, where Schorsch is chairman, today took steps to distance itself from American Realty Capital Properties, emphasizing that it's a separate company from American Realty Capital with a distinct board and management. RCS learned of the accounting matters with the rest of the market on Oct. 29, the company said in a statement.

\*\*\*

Deal Spree

The REIT has completed more than 20 acquisitions since its inception, according to data compiled by Bloomberg. The company's stock price rose to as high as $17.82 in May 2013.

*"There were many people in the space who raised concerns about very rapid growth,"* said Barry Vinocur, the editor of REIT Wrap, an industry newsletter. *"When you grow that rapidly the risk is things may fall through the cracks. Then, there were those who downplayed those concerns saying those raising them were envious."*

Broker Sales

The concerns are spilling into AR Capital. LPL Financial Holdings Inc. said yesterday it is indefinitely suspending sales of investment products sponsored by companies tied to American Realty and RCS. Securities America, a broker-dealer with more than 1,800 advisers, also has suspended sales for two REITs --- Cole Capital Properties V and Phillips Edison - ARC Grocery Center REIT II, the company said in a statement. Sandlapper Securities LLC, an independent broker-dealer based in Greenville, South Carolina also suspended orders for AR Capital REITs, CEO Trevor Gordon said in a phone interview.

*"This accounting error is very troubling to us," Gordon said. "Is this an isolated incident or a systemic problem? We're stepping back at this moment in time. We're not terminating our agreement but we're suspending new purchases for the time being."*

\*\*\*

"Any time your firm gets a public black eye, especially a high-profile black eye, that makes clients nervous," Edde said. *"It makes brokers nervous because they don't want to lose clients. No broker in any firm wants to see their nose bloodied in the press."*

Due Diligence

"Most of the independent broker-dealers that sell nontraded REITs have some due-diligence effort in order to vet the sponsors of the nontraded REITs," Adornato said in a telephone interview from New York. *"It would be difficult if not impossible for any*

*broker to sell shares in any Cole product until the investigation into ARCP/Cole's financial controls is satisfactorily completed.*"

\*\*\*

101.   On November 7, 2014, the Wall Street Journal reported on the turmoil in an article entitled "American Realty Capital Accounting Errors Tied to Employee Bonuses," quoting defendant Rendell's statement that the accounting errors were tied to calculations of bonuses and the results were "incorrect because [executives] fudged something about bonuses to cover up a prior mistake." The report also cited an unnamed source stating that "[t]he accounting errors resulted from incorrect accruals related to bonus payments made across a broad swath of the company, including to management . . . ." The same article quoted Rendell as stating that, despite evidence of intentional accounting fraud, investors were "making a mountain out of a molehill here."

102.   In addition to the loss of shareholder value and investor confidence, the terminated RCS transaction, and the suspension of sales by retail brokers, the Company's ability to finance its operations was also compromised by the fraud. For example, on November 14, 2014, the Company announced that it had received consent from its lenders on its unsecured credit facility for an extension of time to file its third quarter 2014 financial statements. As a condition of the extension, however, the Company's lenders required it to permanently reduce the maximum amount of indebtedness under the unsecured credit facility "from $4.65 billion to $4.0 billion[,]" and to "temporarily" reduce that amount to $3.6 billion until the Company filed its amended financial statements with the SEC.

103.   On November 18, 2014, the Company announced that it had received a notice from NASDAQ stating that it was not in compliance with NASDAQ listing requirements due to the delay in the filing of its financial results.

104.   Beginning on October 30, 2014, at least ten class action lawsuits under the federal securities laws were filed against the Company and others by purchasers of the Company's stock and

other securities issued pursuant to the various offerings alleged herein. These lawsuits, which are now consolidated, have exposed the Company to potentially massive losses and defense costs.

>    **D.**    **Schorsch, Kay and Beeson Suddenly Resign**

105.    On December 15, 2014, ARCP filed a Form 8-K with the SEC announcing that Schorsch had "resigned as Executive Chairman and a director" of the Company and had "also resigned from all other employment and board positions that he held at the Company and its subsidiaries and certain Company-related entities . . . ." According to a release issued that day, the Company was "unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder." The Form 8-K also announced the sudden resignations of Kay, CEO and a director, and Beeson, President and COO.

106.    In a press release, defendant Stanley, newly appointed as the Company's Interim Chairman and CEO, stated that "the steps taken today enhance [the Company's] corporate governance structure, increase transparency and further simplify its business relationships." The December 12, 2014 agreement entered into between Schorsch and ARCP in connection with his resignation, which was filed with the SEC as an attachment to a Form 8-K, listed over 45 entities related to ARCP from which Schorsch had agreed to resign.

107.    These sudden developments only added to the Company's precarious position. The following day, S&P downgraded ARCP's credit rating to junk status and cautioned that further downgrades were possible in the near-term. Moody's likewise downgraded the Company's credit rating below investment grade, with a "negative outlook." Observers were surprised that Kay and Beeson suddenly resigned. According to a J.P. Morgan research report dated December 18, 2014, "[w]e were surprised (and so was the market) by the resignation of David Kay (former CEO) this week since, up until recently Mr. Kay stated that he was there for the long haul."

### E.    McAlister Sues ARCP, Schorsch and Kay for Defamation

108.    On December 18, 2014, just days after Schorsch, Kay and Beeson left the Company, McAlister sued ARCP, Schorsch and Kay in the Supreme Court of the State of New York, County of New York, asserting claims of defamation *per se,* in an action captioned *Lisa Pavelka McAlister v. American Realty Capital Properties, Inc., et al.*, Index No. 162499/2014 (Sup. Ct. N.Y. Cnty.). In a verified complaint, McAlister contradicted the account given by the Board, the Audit Committee, and Kay in the October 29, 2014 SEC filing and press release.

109.    McAlister alleged that, beginning in or about February 2014, while serving as CAO, she "repeatedly informed Mr. Schorsch, Mr. Kay and senior management she had discovered that the Company had, in the fourth quarter of 2013 ('2013 Q4'), and possibly in earlier quarters, suddenly and without any apparent justification or basis, changed the method by which it had historically reported its adjusted funds from operations ('AFFO') relative to previous financial quarters."

110.    Specifically, McAlister alleged that "the Company ceased pro-rating the added-back-to-AFFO non-recurring transaction and deferred financing costs on its 10K and 10Q reports, opting instead to add to and increase the Company's AFFO by the entirety of the added-back costs, including the portion thereof that should have been attributed to non-controlling interests in the operating partnership, ARC Properties Operating Partnership LP, instead of adding to AFFO only the Company's *pro rata* share of the added-back costs."

111.    McAlister alleged that following this discovery, she promptly made senior management, including Schorsch and Kay, aware of the problem, but that upon apprising Kay, he directed her and Block "not to change or correct the fraudulent reports, in an apparent effort to avoid public disclosure of the Company's faltering financial performance."

112.     According to McAlister, during a conference call with her and Block on or around July 28, 2014, "Mr. Schorsch directed Mr. Block to reallocate the funds used to calculate the AFFO and shift the numbers in the 2014 Q2 report in an effort to conceal the previous improper reporting, by having Mr. Block prepare a schedule changing the add-back amortization and write off of deferred financing costs." McAlister alleged that Schorsch and Kay directed the Company to "change[] the beginning point for its AFFO calculation from 'net loss attributable to stockholders (in accordance with U.S. GAAP)' to 'net loss (in accordance with U.S. GAAP).'" McAlister alleged that this change was "not improper" in and of itself, but "made it more difficult for stockholders to see the fraudulent change in the add-backs of non-recurring transaction and deferred financing costs."

113.   McAlister alleged that she "repeatedly expressed her concerns regarding Mr. Schorsch's instruction to shift and reallocate the funds in the 2014 Q2 report, but her objections went ignored." After she was unexpectedly designated as the "principal accountant" on the Company's second quarter 2014 report," she "emailed Jessica Estrada, a Manager at Grant Thornton, the Company's auditors, and called attention to the manipulative accounting practice reflected in the Q2 report." However, McAlister alleged that "Ms. Estrada and Richard LeFleur, a Partner at Grant Thornton, told Ms. McAlister that she could sign and file the 2004 Q2 report 'as is.'"

114.   McAlister alleged that the issues she had raised concerning the Company's accounting resulted in the Audit Committee's internal investigation, that she was "terminated" on or about October 28, 2014, and that her termination was "a clear act of retaliation for her blowing the whistle on ARCP's unlawful accounting and financial reporting practices, and an attempt to use her as a scapegoat for Defendants' fraudulent conduct." McAlister alleged that she "attempted to resolve her claims amicably" by writing a letter to Schorsch and Kay on November 14, 2014.

115.   On or about February 20, 2015, it was reported that McAlister's lawsuit had been dismissed, without prejudice.

### F.   The Restatement Is Announced

116.   On March 2, 2015, the Company released the results of the Audit Committee's investigation, which confirmed that the Company's financial statements were riddled with errors across a broad spectrum of financial reporting requirements. According to the Company's disclosures, net loss had been understated for fiscal year 2013 (including each quarter of 2013) and the second quarter of fiscal year 2014. Net loss had been overstated for the first quarter of fiscal year 2014. In addition, AFFO had been overstated for fiscal years 2011, 2012, 2013 (including each quarter of 2013), and the first two quarters of 2014.

117.   In a Form 10-K/A for 2013 filed on March 2, 2015, the Company provided details of the restatement, pursuant to which (a) for full year 2013, previously reported net loss and net loss per share would increase while AFFO (net method) and AFFO per share would decrease by approximately $16.8 million, $0.08 per share, $43.9 million and $0.20 per share, respectively, as compared to originally reported amounts; (b) for the first quarter of 2014, previously reported net loss and net loss per share, AFFO (net method) and AFFO per share would decrease by approximately $17.2 million, $0.03 per share, $38.5 million and $0.07 per share, respectively, as compared to originally reported amounts; (c) for the second quarter of 2014, previously reported net loss and net loss per share would increase while AFFO (gross method) and AFFO per share would decrease by approximately $14.4 million, $0.02 per share, $19.3 million and $0.03 per share, respectively, as compared to originally reported amounts.

118.   The Audit Committee's investigation also identified apparent instances of personal enrichment or self-dealing by Schorsch and Block. For example, the investigation uncovered lease

payments to a Schorsch controlled entity for a building in Newport, Rhode Island that the Company never occupied, which payments were not "sufficiently documented" and "warrant scrutiny." The Company stated that it had "recovered consideration valued at approximately $8.5 million in respect of certain such payments that the Company concluded were inappropriate."

119.   In addition, the investigation found that certain equity awards made to Schorsch and Block in or about early 2014 contained provisions that, as drafted, "were more favorable to them than the Compensation Committee of the Board had approved." Schorsch and Block agreed to relinquish these equity awards in connection with their departures from the Company, except that Schorsch was permitted to keep 1,000,000 restricted shares, for which vesting was accelerated.

120.   Finally, the Form 10-K/A revealed a shocking array of material weaknesses all across the Company's internal controls over financial reporting, and specifically with respect to the reporting of the critical AFFO measure, on which the Company placed so much emphasis:

> **Material Weaknesses in Disclosure Controls and Procedures** – The Company's disclosure controls and procedures were not properly designed or implemented to ensure that the information contained in the Company's periodic reports and other SEC filings correctly reflected the information contained in the Company's accounting records and other supporting information and that AFFO per share (a non-GAAP measure that is an important industry metric) was correctly calculated. In addition, the Company did not have appropriate controls to ensure that its SEC filings were reviewed on a timely basis by senior management or that significant changes to amounts or other disclosures contained in a document that had previously been reviewed and approved by the Audit Committee were brought to the attention of the Audit Committee or its Chair for review and approval before the document was filed with the SEC. Finally, the Company did not have appropriate controls over the formulation of AFFO per share guidance or the periodic re-assessment of the Company's ability to meet its guidance.

> **Material Weaknesses in Internal Control Over Financial Reporting** – A material weakness is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

During 2013, due in part to a number of large portfolio acquisitions, the Company experienced significant growth and increases in the complexity of its financial reporting and number of non-routine transactions. In late 2013, as a result of three impending transactions – the transition to self-management announced in August 2013 and effective on January 8, 2014, the acquisition of ARCT IV announced in July 2013 and completed on January 3, 2014 and the acquisition of Cole Real Estate Investments, Inc. announced in October 2013 and completed on February 7, 2014 – the complexity of the Company's transactions and the need for accounting judgments and estimates became more prevalent and had a severe impact on the Company's control environment. These changes in business conditions, combined with the pressure of market expectations inherent in announcing AFFO per share guidance for 2014, demanded an enhanced control environment.

The control environment, as part of the internal control framework, sets the tone of an organization, influencing the control consciousness of its people and providing discipline and structure. Current management identified the following material weaknesses through its re-assessment of the Company's internal control over financial reporting:

**Related Party Transactions and Conflicts of Interest** – The Company did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates. Without the appropriate controls, the Company made certain payments to the Former Manager and its affiliates that were not sufficiently documented or that otherwise warrant scrutiny.

**Equity-Based Compensation** – The Company did not maintain appropriate controls over various grants of equity-based compensation. In the fourth quarter of 2013, in anticipation of the Company's transition to self-management, the Company entered into employment agreements with the Company's former Executive Chairman and Chief Executive Officer and its former Chief Financial Officer, and also approved the 2014 Outperformance Plan pursuant to which awards were made to them on January 8, 2014. Without the appropriate controls, these documents contained terms that were inconsistent with the terms authorized by the Compensation Committee. Additionally, the Company did not obtain copies of or administer the equity awards made by means of block grants allocated by the Former Manager and its affiliates, nor did the Company review the awards for consistency with the Compensation Committee's authorization.

**Aggregation of Significant Deficiencies Within Business Process-Level Control Activities and Financial Reporting Controls** – The following significant deficiencies together constitute a material weakness:

> **Accounting Close Process** – The Company did not have consistent policies and procedures throughout its offices relating to purchase

accounting, accounting for gain or loss on disposition and testing for impairment. In addition, senior management did not establish clear reporting lines and job responsibilities or promote accountability over business process control activities.

**Critical Accounting Estimates and Non-Routine Transactions** – The Company did not maintain effective controls or develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates on a periodic basis.

121.    These material weaknesses in financial reporting, and the reasons they came to exist, were essentially identical to the concerns raised by Marcato in its June 2014 letter to Michelson. Yet, the Board, and the Audit Committee in particular, had failed to act to remediate the internal control issues, even as Schorsch and the Board continued to engage in billions of dollars in transactions.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

122.    Plaintiffs bring this action on behalf of Vereit to redress injuries suffered, and to be suffered, by Vereit as a direct result of violations and/or breaches of fiduciary duty alleged herein. Vereit is named as a nominal defendant solely in a derivative capacity.

123.    Plaintiffs will adequately and fairly represent the interests of Vereit in enforcing and prosecuting its rights, and have hired counsel experienced in shareholder litigation.  Plaintiffs were shareholders of Vereit at the time of the wrongdoing complained of, have continuously been shareholders since that time, and are current Vereit shareholders.

124.    By letter dated August 10, 2015, following the dismissal of *Serafin* for failure to make a demand on the Board, plaintiffs made a demand on the Board to investigate and pursue legal remedies against all wrongdoers with responsibility for the fraud. By letter dated September 17, 2015, the Board refused the demand, based upon reasoning set forth in its letter dated June 18, 2015 refusing the Witchko demand. For the reasons alleged herein, the Board's conduct was unreasonable and taken in

bad faith, and its refusal of the demand is not protected by the business judgment rule.

125. Notwithstanding the severity of the fraud, which resulted in the highly suspicious departure of the entire management team, and precipitated a criminal investigation, the Board failed to convene a special committee of disinterested members to consider the demand.

126. The Board that rejected the Witchko demand in June 2015 (upon which the refusal of plaintiffs' demand is premised) consisted of six directors - three directors (Rufrano, Richardson and Frater) who joined ARCP after the fraud was revealed, and three directors (Frank, Andruskevich and Stanley) who served as directors during the fraud. By any reasonable measure, Frank, Andruskevich and Stanley should have been excluded from the consideration of any shareholder demand, given that they were being called upon to investigate a fraud which had occurred on their watch, and, at the time, were each named as defendants in the consolidated securities class action complaint.

127. By September 2015, when the Board responded to plaintiffs' demand, the Board consisted of a majority of new directors. Yet, rather than undertake a new and proper investigation into the issues raised in the demand (which were materially different from the Witchko demand), the Board simply rubber-stamped the Witchko demand refusal after some discussion at a single Board meeting.

128. Indeed, at no time did the Board hire independent counsel to actually *investigate* the claims. The Board retained Saul Ewing LLP ("Saul") to advise it "in connection with" shareholder demands, but Saul did not conduct an investigation of the underlying facts. Instead, at an April 20, 2015 Board meeting convened in connection with the Witchko demand, the Board purportedly received "reports" from counsel for the Audit Committee (Weil Gotshal & Manges LLP), and counsel defending the Company in the securities litigation and government investigations (Milbank Tweed Hadley & McCloy LLP). But in those capacities, neither of these firms reported to the Board on the

viability of the Company's *own* breach of fiduciary claims. In fact, at the time of its report to the Board, Weil Gotshal & Manges LLP was *defending* Frank, Andruskevich and Stanley against pending derivative claims (including *Serafin*), underscoring the sham nature of the process.

129.   At no time did the Board commission or produce a written report detailing its process, methodology, or conclusions. Nor does it appear that the Board interviewed any witnesses or reviewed any documents. A written report substantiated with evidence is the touchstone of any thorough investigation conducted by a competent board of directors. The lack of a written report is particularly glaring, given the myriad of factors the Board purports to have discussed at its Board meetings, such as the chances of success, possible damages, analysis of legal expenses, and statute of limitation issues (among other complex issues). These matters require substantial inquiry and analysis. But here, the Board based its decision to reject the demand, and let the Company's valuable claims languish indefinitely, based on some informal discussions occurring at two Board meetings.

130.   Many of these factors would provide no basis for the refusal of the demand in any event. For example, the Board purportedly weighed "ARCP's charter exculpating directors and officers from personal liability for monetary damages to the fullest extent permitted by law." However, under Maryland law, this provision does not apply where, as already admitted here, the alleged misconduct by at least some officers or directors is "the result of <u>active and deliberate dishonesty</u> and was material to the cause of action adjudicated in the proceeding." Similarly, the Board cited as a factor the additional time management "would necessarily devote" to pursuing the claims. But any such time would likely be minimally incremental, given that management will be dealing with fraud-related litigation for years to come. Any additional time expended would be more than justified given the size and strength of the claims.

131.   Similarly, in the absence of a written report, the Board cannot demonstrate that it

actually evaluated in any detail matters related to damages, such as authorizing an investigation into the personal assets of the defendants, or considering what effect putting off the claims indefinitely might have on the Company's ability to collect from the possibly rapidly diminishing assets of the defendants. Other litigants, including the securities class action and other shareholder plaintiffs, are pursuing some or all of these same defendants, and there is no justification for the Company failing to proactively pursue its own recovery against these wrongdoers.

132.    Furthermore, in the absence of a written report, the conclusory assertions in the refusal of the demand that prosecuting the derivative claims would "jeopardize the Company's defenses" in other proceedings or cause "significant impairment" of the stock price are meritless and unsubstantiated. Without having even investigated the claims to determine (a) what breaches of fiduciary duty occurred and by whom, and (b) what potential remedies are available to the Company, these assertions are mere conjecture.

133.    In addition, the assertion that the Company could be harmed by prosecution of its own breach of fiduciary duty claims is unsupported. The Company has already admitted that at least some of its officers and/or directors committed intentional fraud. The Company's admission is consistent with McAlister's allegations in her lawsuit against ARCP, which specifically named Schorsch, Kay, Block and "senior management" as complicit in deliberately false financial reporting. Now that the damaging admission of intentional fraud has been made, and the responsible parties are gone from the Company, the Board must protect the Company's claims rather than sit back idly.

134.    Likewise, the position set forth in the refusal of the demand that the Company should wait around because the ongoing securities litigation and government investigations might "yield more information" about the claims is baseless. All necessary information can and should be developed in the Company's own filed litigation, and there is no legitimate reason to wait around for

other litigants to develop it or to abdicate the Company's responsibility to do the same. Furthermore, key information regarding the claims has already been established and is in the Company's possession, given the Company's public admissions of (a) intentional conduct by, at least, some of its fiduciaries, (b) the falsity of the Company's financial reporting, and (c) the degraded state of its internal controls, for which the fiduciaries were directly responsible.

135.    The Board's decision to wait around on the basis that any future claim would still be within the statute of limitation is similarly evidence of a failed and unreasonable process. Some of the alleged misconduct at issue dates back to 2011, and it has already been approximately one year since the fraud was revealed in October 2014, yet the Company has failed to act. As time passes important evidence may dissipate and memories may fade. As the Company sits on its rights and fails to pursue relevant facts, claims are necessarily weakened and possible sources of recovery by which the Company might offset its likely substantial losses are diminished.

136.    In sum, nothing in the record indicates a reasonable or good faith attempt by the Board to actually evaluate the demand, or to consider the existence of meritorious claims for non-exculpable breaches by at least some of the officers or directors. Taken together with the Board's failure to convene a proper committee, conduct a reasonable investigation, or create a report documenting its supposed investigation, the Board's response to plaintiffs' demand cannot be deemed a valid exercise of business judgment entitled to any presumption of reasonableness and good faith.

137.    Under these circumstances, plaintiffs must act to preserve and prosecute the Company's claims.

## COUNT I

## BREACH OF FIDUCIARY DUTY

## (Against the Individual Defendants)

138.   Plaintiffs incorporate by reference the allegations set forth above.

139.   Each of the Individual Defendants was a director and/or officer of ARCP during relevant times, and as such owed to the Company fiduciary obligations.  In violation of these fiduciary duties of good faith, candor, and loyalty, the Individual Defendants failed to disclose, or caused the Company to fail to disclose, material information and/or made material misstatements to its shareholders regarding the Company's business and financial condition.

140.   These Individual Defendants knew or recklessly disregarded that the statements made about ARCP's business and its financial condition were false and misleading when made.

141.   The preparation and dissemination of inaccurate information and SEC filings alleged herein represents a failure by the Individual Defendants to assure the existence within ARCP of appropriate and adequate internal financial controls, and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting.

142.   Further, when put on notice of internal control problems, the Individual Defendants had a fiduciary duty to promptly take appropriate action to correct the misconduct and prevent its recurrence. The Individual Defendants willfully ignored obvious and pervasive problems with ARCP's internal controls alleged herein, and by deliberate and knowing indifference failed to make a good faith effort to correct the problems until it was far too late.

143.   The Individual Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to its shareholders materially inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures.  These

actions could not have been a good faith exercise of prudent business judgment.

144.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision. By virtue of their conduct alleged herein, the Individual Defendants engaged in intentional misconduct and knowing violations of their duties.

145.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, ARCP has sustained significant damages, not only monetarily as alleged herein, but also to its corporate reputation and goodwill.

146.   In addition, due to their participation in the misconduct, certain defendants received incentive based compensation benefits during fiscal periods for which financial results have now been restated, which compensation must be disgorged in whole or in part.

147.   As a result of the misconduct alleged herein, the Individual Defendants are liable to ARCP.

## COUNT II

## CONTRIBUTION AND INDEMNIFICATION

### (Against the Individual Defendants)

148.   Plaintiff incorporates by reference the allegations set forth above.

149.   ARCP is alleged to be liable to private persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to ARCP.

150.   ARCP's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

151.   ARCP is entitled to contribution and indemnification from each of the Individual

Defendants in connection with all such claims that have been, are, or may in the future be asserted against ARCP by virtue of the Individual Defendants' wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of Vereit, demand judgment as follows:

A.    Determining that this suit is a proper derivative action and certifying plaintiffs as appropriate representatives of Vereit for said action;

B.    Declaring that the Individual Defendants have violated their fiduciary duties to Vereit and its shareholders;

C.    Awarding Vereit the damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, in an amount to be determined at trial, together with pre-judgment and post-judgment interest;

D.    Equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued upon hereunder, including (a) the institution of appropriate corporate governance reforms and internal control improvements to remediate and prevent the recurrence of the accounting improprieties and other misconduct alleged herein, and (b) attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that plaintiffs have an effective remedy;

E.    Awarding plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: October 30, 2015

NEWMAN FERRARA LLP

*s/ Jeffrey M. Norton*

Jeffrey M. Norton
1250 Broadway, 27th Floor
New York, New York 10001
Telephone: (212) 619-5400
Facsimile: (212) 619-3090
jnorton@nfllp.com

*Attorneys for Plaintiff Thomas Serafin*

SCHUBERT JONCKHEER & KOLBE LLP
Robert C. Schubert
Willem F. Jonckheer
Three Embarcadero Center, Suite 1650
San Francisco, California 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
rschubert@schubertlawfirm.com
wjnonckheer@schubertlawfirm.com

LAW OFFICES OF CURTIS V. TRINKO, LLP
Curtis V. Trinko
Jennifer E. Traystman
C. William Margrabe
16 West 46th Street, 7th Floor
New York, New York 10036
Telephone: (212) 490-9550
Facsimile: (212) 986-0158
ctrinko@trinko.com
jtraystman@trinko.com
wmargrabe@trinko.com

*Attorneys for Plaintiff Edward Froehner*

54

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
127A Cove Road
Oyster Bay Cove, New York 11771
Telephone: (516) 922-5427
tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff Michele Graham Turner*
*1995 Revocable Trust, Jeffrey Turner as Trustee*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Additional Plaintiffs' Counsel*

## Verification

I, THOMAS SERAFIN, hereby verify and declare under the penalty of perjury that I have reviewed the foregoing Shareholder Derivative Complaint (the "Complaint"), know the contents thereof, and, authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on the investigation of counsel. I have personal knowledge of the facts stated in paragraph 22 of the Complaint, which are true and correct.

Dated: October 29, 2015

THOMAS SERAFIN

## VERIFICATION

I, Jeffrey Turner, as a trustee of the Michele Graham Turner 1995 Revocable Trust, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 22nd day of October, 2015.

Jeffrey Turner,
as a trustee of the Michele Graham Turner 1995 Revocable Trust

## VERIFICATION OF EDWARD L. FROEHNER

I, Edward L. Froehner, hereby verify that I have read the attached shareholder derivative complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information and belief, based on the investigation of counsel. I have personal knowledge of the facts stated as to myself, which are true and correct.

Dated:  October 28, 2015

Edward L. Froehner